# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00449-CV

---

**April Judith Urbina, Appellant**

**v.**

**Mark Rangel, Appellee**

---

### FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-AG-21-000923, THE HONORABLE MADELEINE CONNOR, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Mother April Judith Urbina[1] appeals the final order in a suit affecting the parent-child relationship and its order of enforcement. Representing herself, Urbina challenges the trial court's (1) designation of father Mark Anthony Rangel as the managing conservator who has the exclusive right to determine the primary residence of their child I.R.; (2) order of enforcement finding her in contempt for two violations of the associate judge's temporary order and fining her $500 for each violation; (3) permanent injunction preventing either parent from either allowing I.R. to be in a residence with firearms that are not properly secured or bringing firearms to exchanges; (4) setting of Urbina's monthly child support obligations at $520.80 a month; and (5) alleged violations of Canon 2A of the Texas Code of Judicial Conduct. We affirm the

---

[1] In court records, Urbina is referred to as Sanchez, Sanchez-Briseno, and Urbina. Where the non-parent witnesses have the same last names as the parents, we use those witnesses' first names.

challenged sections of the trial court's final order and dismiss Urbina's second issue—related to the order of enforcement—for want of jurisdiction.

## BACKGROUND

I.R., who was born in 2015, is Urbina and Rangel's only child together. Urbina and Rangel ended their relationship in October 2020. The Attorney General filed this SAPCR suit, asking the trial court to appoint appropriate conservators and order appropriate support. Rangel filed an original answer and counter-petition.

In initial temporary orders an associate judge ordered that Rangel take temporary possession of I.R. "every other weekend." The associate judge eventually held a full temporary-orders hearing and subsequently issued temporary orders. In those orders, the associate judge appointed Rangel and Urbina joint managing conservators; ordered them to share "Required Information" including their employer's name, address, and phone number; set out "Conservatorship Duties," including the duty to share significant information about I.R.'s health, education, and welfare; ordered Rangel to pay Urbina $519.58 per month in child support; ordered that I.R.'s residence be in Coryell County, McLennan County, Travis County or their contiguous counties; ordered the parents to keep I.R. enrolled in her current school for the remainder of the school year; reserved the determination of which conservator would be designated as the parent with the exclusive right to determine the residence of I.R. for final trial; and ordered that Rangel and Urbina either agree on possession or follow a custom possession order giving Urbina primary possession. *See* Tex. Fam. Code § 201.007(a)(14)(C) (providing that associate judge may render and sign temporary orders subject to de novo review by referring court).

Rangel requested a de novo hearing before the referring court under Texas Family Code Section 201.015. At the end of that de novo hearing the district court reminded the parties

2

that only the temporary orders were at issue, and the final hearing was pending. The district court decreased the guideline support amount paid by Rangel to $481, as recommended by the attorney general's office; ordered Rangel to add I.R. to his medical and dental insurance; and otherwise kept the temporary orders intact. Rangel later filed a Petition for Enforcement.

On September 19, 20, and 21, 2022, a final hearing was conducted in district court and Rangel's Petition for Enforcement was heard, along with the trial. At the end of the final hearing, the court found two alleged violations of the temporary order true—the first, a violation of the temporary-order provision that Urbina provide Rangel with her employer's information, and the second, a violation of the temporary-order provision that Urbina provide Rangel with significant information about I.R.'s health, education, and welfare. In the final order, the court appointed the parents joint managing conservators; designated Rangel as the conservator with the exclusive right to determine the primary residence of I.R. within Travis County, McLennan County, or Coryell County; ordered Urbina pay $520.80 per month child support; and permanently enjoined either parent from either allowing I.R. to be in a residence with firearms not properly secured or bringing firearms to exchanges. The court held a hearing on a Motion to Enter on March 24, 2023, and signed final orders on July 14, 2023.

Urbina appealed.

## ANALYSIS

### The Designation of Rangel As the Conservator Who Has the Exclusive Right to Determine the Primary Residence of I.R.

Urbina argues that the trial court abused its discretion because it switched custody based solely on email exchanges.

3

*Applicable Law and Standard of Review*

When the trial court appoints joint managing conservators, it must designate the conservator who has the exclusive right to determine the primary residence of the child. *Id*. § 153.134(b)(1). In determining which joint conservator should have the exclusive right, the best interest of the child is the court's primary consideration, as it is in determining all "issues of conservatorship and possession of and access to the child." *Id*. § 153.002. We review a trial court's decisions regarding conservatorship, including a determination of which conservator will have the exclusive right to establish the child's primary residence, for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). A trial court abuses its discretion if it acts arbitrarily or unreasonably or without regard to guiding rules or principles. *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.).

In family law cases, the abuse-of-discretion standard overlaps with traditional sufficiency standards of review. *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). Consequently, in applying the standard, we engage in a two-pronged inquiry: (1) whether the trial court had sufficient information upon which to exercise its discretion and (2) whether the trial court erred in its application of that discretion. *Id*. "An abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision." *Echols*, 85 S.W.3d at 477. The focus of the first inquiry is the sufficiency of the evidence, which we answer using traditional sufficiency standards of review. *Kazmi v. Kazmi*, 693 S.W.3d 556, 566 (Tex. App.—Austin 2023, pet denied).

In reviewing for legal sufficiency, "we view the evidence in the light most favorable to the verdict, crediting favorable evidence when reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not." *Pike v. Texas EMC Mgmt.,*

*LLC*, 610 S.W.3d 763, 794 (Tex. 2020). A party challenging the legal sufficiency of an adverse finding on which it did not bear the burden of proof at trial "must demonstrate on appeal that no evidence supports the adverse finding." *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). We will sustain a no-evidence challenge when (1) evidence of a vital fact is absent, (2) rules of law or evidence bar us from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Bos v. Smith*, 556 S.W.3d 293, 299-300 (Tex. 2018).

In reviewing for factual sufficiency, "we examine the entire record and consider and weigh all the evidence, both in support of and contrary to the challenged finding." *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). When a party attacks the factual sufficiency of an adverse finding on which it did not bear the burden of proof, we will set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Under either standard, the trier of fact is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

*Application*

1. ***Whether the Trial Court Had Sufficient Information Upon Which to Exercise Its Discretion***

The trial court heard testimony from Rangel and his fiancée, mother, and attorney and from Urbina and her fiancé, mother, and aunt. Much of the testimony showed that I.R. was a happy and healthy child, and that both parents were loving and caring and capable. Other

5

testimony touched on family violence, fraught communications, tense exchanges, and disagreements over education.

**Violence**

Urbina's aunt Marisol Sanchez testified that in February 2021, she saw Urbina discipline I.R., who was then six, for lying by slapping I.R. in the face and yelling at her aggressively—a punishment she deemed disproportionate to the infraction. After Marisol emailed Urbina that she was planning to testify in favor of Rangel, Urbina emailed her back in a hostile manner, stating, among other things, "How DARE you think you have ANY say in what's in the best interest for MY DAUGHTER," and "Congratulations, you kicked the hornets nest. You want to get in the middle of momma bear and her cub? Let's see where that gets you."

Rangel also testified that Urbina had been physical with I.R. Urbina "has very strict and firm parenting skills and tactics" and a "heavy hand, especially with punishment." The last time he and Urbina lived together he woke up to Urbina yelling, berating I.R., and standing over her ready to strike. He hopped out of bed, grabbed Urbina from her waist to get her away from I.R. and then picked up I.R. and consoled her. Rangel's "concerns were that she was going to strike her and use corporal punishment to teach her a lesson" for having an accident. And then Urbina "could not take accountability for what she did." She changed the story the next day to "she didn't hit her, so she didn't need to apologize, and "now to this narrative that I grabbed her by the neck."

Rangel went on to describe the times Urbina had been violent towards him. She "kicked me in the head and knocked me unconscious. I woke up with blood all over my face and the carpet. And I—I was left with a black eye and, well, I have a scar now." She had tried to

punch and claw at him and had stomped his foot. He told only his mother, Gladys Rangel, about the assaults.

Gladys testified that during the time the couple were together at Baylor, Urbina attacked Rangel, who because of his size would not defend himself against the much smaller Urbina. She testified that he "had arrived at one time with a gash on his eyebrow. There was another time he had scratches on his neck, another time he had a big bulge on his foot. Gladys also testified that she had witnessed Urbina be a little bit aggressive with I.R.

Urbina testified that it was Rangel who was the abuser. "The last thing that my daughter saw before we left was him grabbing me by the throat and throwing me across the room." She stated that she believes in corporal punishment and doesn't like other people telling her how to raise her child.

**Communication**

Rangel testified that "there's no room for [the way Urbina communicates] in a coparenting relationship," and that her messages can turn a great day into a sour one. "It's difficult— it's difficult when I want to reach out and ask— just ask for anything because I feel that she's just going to do her best to put me down or hit me below the belt." He testified that Urbina refused to follow the instructions given by the district court at the de novo hearing; constantly threw verbal barbs causing him to walk on eggshells; never got back to him when he asked her to provide him with I.R.'s birth certificate so he could put I.R. on his medical insurance; mocked him when he checked on her and I.R. during stormy weather; and told him to consult with her then-fiancé Norman Urbina instead of coparenting with her.

Rangel testified that Urbina has distanced herself from most of her own family, but that he had shared his time with I.R. with them to keep them connected. He did so at Christmas so that I.R. could see Urbina's family and get her Christmas gifts from them.

Rangel's fiancée Brooke Boswell testified about the difficulty of communicating with Urbina and Norman. "It can be the simplest question, and we know that it's going to be a terrible response, but as a parent, it's [Rangel's] responsibility to ask anyway, to still reach out regardless of the volatility issues they respond with, but it's been a pattern this entire time." She specifically complained about their "not allowing I.R. to play Roblox" with her son Luca, keeping them from interacting.

Rangel's attorney testified that Urbina and Norman's erratic and aggressive behavior and communications had significantly increased attorney's fees.

Urbina testified she cut Rangel off from possessing or accessing any information about I.R. for a period of two months before they went to court because at that point I.R. did not want to see or speak to Rangel. Urbina acknowledged repeatedly communicating with Rangel with hostile language over the two years this suit was pending, and that she did not markedly change her style of communication after the district court directed her to.[2] She testified that she does not respect Rangel, "as a man, as a person or as a coparent. I have no respect for someone that put their hands on me." But she said she does not talk about Rangel in front of I.R. and that she does not "initiate anything; I simply react." She also said that Rangel's cordial communications in emails were a front; he "knows how to put up a persona on things that are written" and "doesn't

---

[2] For example, she acknowledges sending pages of emails using coarse language such as: "And again, in case your retarded brain doesn't comprehend, you do not give me orders. The next time, go fuck yourself. Who the fuck you think you are giving me orders?"; "Bitch shut the fuck up."; "You? [I.R.'s] father? What are you, a fucking comedian? You are no father, at best you are a sperm donor attempting to act as a father now that there's child support in the loop."

8

swear to me in messages" but "does it in person or over the phone." Urbina testified that at her father's funeral, her relatives had yelled at her and attacked her in front of I.R. and that I.R. does not want to be around them and that is why she does not communicate with them.

**Exchanges**

Rangel testified about how, in July 2021, Urbina told him that he would not be able to see I.R. "until the Court orders it"; thwarted a trip to Six Flags he had planned for I.R.; refused to release I.R. to his fiancée or mother; and came armed to exchanges. Boswell testified about the time that Urbina and Norman brought I.R. back accompanied by Norman's motorcycle club.

Urbina testified that she withheld I.R. from Rangel because Rangel constantly threatened to take I.R. away from her. She stated that she carries a gun on her hip to exchanges to protect herself from Rangel and that she and Norman and I.R. are all educated and trained with guns. She said she refused to release I.R. to Rangel's fiancée because I.R. did not have on a tracker and refused to release I.R. to Rangel's mom because Rangel's mom "is an alcoholic."

**Education**

Rangel testified that while I.R. was in school, Urbina would not tell him who her teacher was. Urbina unilaterally began homeschooling I.R. and then refused to provide Rangel with information about the homeschool program she was using. Urbina defended homeschooling I.R., noting that she is a teaching professional, having taught and tutored students when she was a graduate student at Texas Tech.

Rangel and Urbina together presented over a hundred exhibits. Many of Rangel's exhibits were copies of email communications. One of Urbina's exhibits was a compilation of home videos of herself, Norman, and I.R.

9

After reviewing the entire record under the legal and factual sufficiency standards to determine if the trial court had sufficient evidence upon which to exercise its discretion and designate Rangel as the managing conservator who has the exclusive right to determine I.R.'s primary residence, we hold that it did. *Zeifman*, 212 S.W.3d at 587; *Kazmi*, 693 S.W.3d at 566; *Pike*, 610 S.W.3d at 794; *Graham Cent. Station, Inc.,* 442 S.W.3d at 263; *Bos*, 556 S.W.3d at 299-300; *Ortiz*, 917 S.W.2d at 772; *Cain*, 709 S.W.2d at 176.

### 2. *Whether the Trial Court Erred In Its Application of That Discretion*

Urbina argues that the trial court abused its discretion because it modified conservatorship without making a finding of a material and substantial change in circumstances and without sufficient evidence of such a change. *See* Tex. Fam. Code § 156.101(a)(1). But the statutory requirements for a modification do not apply until after the trial court has issued a final custody determination. Original conservatorship, possession, and access cases, such as this one, are governed by Chapter 153 of the Texas Family Code, while modification cases are governed by Chapter 156. *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000). Here, the associate judge left the determination of which conservator would be designated as the parent with the exclusive right to determine the residence of I.R. for a final trial and the district court did not change the associate judge's temporary orders after the de novo hearing. Because the court did not modify conservatorship, but finally adjudicated it in the original suit, the burdens set out in Section 156.101(a)(1) do not apply. *Id.*

Urbina also argues that the court's decision to make Rangel the primary managing conservator with the exclusive right to designate the child's residence "came solely from the email exchanges that [her] daughter had absolutely no knowledge of." The court expressed concern that Urbina's harsh communications had to have some effect on the child. The court noted that Urbina

had been told to change her communication style at the de novo hearing, but that Urbina never did. The court stated that hostile communications "[have] got to trickle down to the kid. It's just got to. You can't have—harbor such intense feelings, one way or another about a person, and the kid not get it, right?" The court also noted that Urbina's failures to turn over information were both "unnecessary" and "harmful." The fact that Urbina did not change her communication style even after being instructed by the district court to "go back and read the Children's Bill of Rights and get to a better place about how to communicate" is some evidence of her unwillingness to make positive changes to co-parent amicably.

Further, as discussed above, Urbina's email communications were only part of the evidence of Urbina's hostile behavior informing the trial court's determination.

Although much testimony touched on violence, the court declined to make a family violence finding. *See* Tex. Fam. Code § 153.004 (discussing impact of family violence finding on court's conservatorship, possession, and access orders). But the court granted Rangel's request that both parties be enjoined from "using corporal punishment on the child." The court also enjoined the parents from bringing guns to the exchanges. Although the court declined to make a finding that Urbina's failure to consult Rangel about homeschooling violated the temporary orders which had required cooperation on education, the evidence that Urbina failed to consult Rangel, or to cooperate with him when he wanted information about the program she was using, or how I.R. was progressing, is evidence of her unwillingness to respectfully co-parent.

The trial court is best able "to observe the demeanor and personalities of the witnesses and [to] 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *See Echols*, 85 S.W.3d at 477. We will not re-weigh the evidence bearing on the best-interest determination. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761; *City of Keller*

11

*v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). We conclude that there is "at least some evidence of substantive and probative character" to support the trial court's conclusion that it is in I.R.'s best interest to give Rangel the right to determine I.R.'s primary residence. *See Echols*, 85 S.W.3d at 477. That is, the trial court had sufficient information on which to exercise its discretion and did not err in the application of that discretion. *See id*. at 477-78. We overrule Urbina's conservatorship issue.

**The Order of Enforcement Finding Urbina in Contempt for Two Separate Violations of The Temporary Order, and Fining Her $500 for Each Violation**

Urbina argues that the trial court violated her due-process rights when it refused to let her testify on rebuttal after Rangel presented evidence about her violations of the temporary order. The Family Code provides that a motion for enforcement can be filed to enforce any provision of a temporary order rendered in a suit, and a court may enforce by contempt any provision of a temporary order. Tex. Fam. Code § 157.001(a), (b). Texas courts have consistently held that contemnors whose alleged contemptuous behavior occurred outside of court are entitled to procedural due process protections before they may be held in contempt. *In re Zandi*, 270 S.W.3d 76, 77 (Tex. 2008). Due process requires that the constructive contemnor be given full and complete notification and a reasonable opportunity to meet the charges by way of defense or explanation. *Ex parte Gordon*, 584 S.W.2d 686, 688 (Tex. 1979). Contempt findings in SAPCRs are generally reviewed under the abuse-of-discretion standard. *In re Janson*, 614 S.W.3d 724, 727 (Tex. 2020). But contempt orders are not directly appealable, so we lack jurisdiction over this portion of Urbina's appeal. *See Cadle Co. v. Lobingier*, 50 S.W.3d 662, 671 (Tex. App.— Fort Worth 2001, pet. denied) ("A contempt judgment is reviewable only via a petition for writ of habeas corpus (if the contemnor is confined) or a petition for writ of mandamus (if no confinement

is involved)."); Tex. R. App. P. 52 (governing original proceedings, including petitions for writ of habeas corpus and writ of mandamus). Decisions in contempt proceedings are not appealable, even when appealed along with a judgment that is appealable. *Cadle*, 50 S.W.3d at 671.

We therefore dismiss Urbina's complaints concerning the enforcement order for want of jurisdiction.

**The Permanent Injunction on Unsecured Firearms and Firearms at Exchanges**

Urbina argues that the firearms injunctions violate the Second Amendment.

*Applicable Law and Standard of Review*

The Supreme Court of the United States has recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 791 (2010). It has also held that those Amendments protect an individual's right to carry a handgun for self-defense outside the home. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 10 (2022).

"Like most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. The right is subject to limitations, such as the "longstanding prohibitions on the possession of firearms by felons and the mentally ill," or "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id*. at 626–27.

13

In *Bruen*, the Supreme Court rejected the "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny and clarified that only history matters:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 17.

### *Application*

The court, in its final order, enjoined the parties from (1) "allowing the child to be in a residence with firearms that are not properly secured"[3] and (2) "bringing firearms to exchanges." These restrictions concern conduct that is presumptively protected by the Constitution. We therefore look to whether the trial court's regulations are part of the historical tradition limiting the outer bounds of the right to keep and bear arms.

First, "[a]t the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers." *United States v. Rahimi*, 602 U.S. 680, 691 (2024). Because the trial court's restrictive injunction barring each parent from failing to secure firearms has a historical analogue in rules governing firearm storage, we find it does not violate the Second Amendment. *Id*. at 693.

---

[3] The injunction required that the firearms be "strapped on a person, held in a locked gun safe or secured with a trigger lock."

14

Second, "[t]he historical evidence from antebellum America demonstrates that the manner of public carry was subject to reasonable regulation." *Bruen*, 597 U.S. at 59. "From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Rahimi*, 602 U.S. at 693. Regulations targeting individuals who physically threatened others persisted, and the conduct was often addressed through ordinary civil actions, such as prohibitions against individuals who threatened others. *Id.* at 694. Prohibitions on "going armed" were incorporated into American jurisprudence through the common law. *Id.* at 698.

The trial court heard evidence warranting a prohibition on "going armed" to the exchanges—specifically, as detailed above, each parent testified that they had been assaulted by the other and that each felt threatened by the other. And exchanges of I.R. had been fraught in the past even when taking place at a neutral public setting. Urbina testified specifically that she carries her gun to exchanges to protect herself "specifically and directly from the petitioner." Norman similarly testified "I identify as dangerous, period," "I don't turn the other cheek," and "I react . . . in an offensive manner when my family or myself are being attacked in any kind of way." He also testified he does not respect Rangel "because I don't respect people who put hands on women." Rangel testified that Urbina and Norman create a dangerous environment with their open carry and intimidating behavior at the exchanges. "There's times when I don't know if I'm actually going to make it home from an exchange." He testified that he and Brooke had made a safety plan for the exchanges—in case "anything ever happens." Because the trial court's restrictive injunction barring each parent from going armed to exchanges has a historical analogue in the "going armed" regulations of the manner of public carry, we find it does not violate the Second Amendment. *Id.* at 693. We overrule Urbina's Second Amendment claims.

15

*Application*

**The Setting of Urbina's Monthly Child-Support Obligations at $520.80 per Month**

Urbina argues the amount of child support she was ordered to pay was "incorrectly calculated" because her paychecks came biweekly, she makes $15.00 per hour, and she works an average of 16 hours per week and a maximum of 20 hours per week. She contends that the low-income child-support guidelines should apply to her, so her obligation would be 15% of her net resources, making the monthly payment that the trial court should have ordered $142.55.

*Applicable Law and Standard of Review*

A trial court has discretion to set child support within the parameters provided by the Texas Family Code. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011). Under the Code, awards are generally calculated based on a percentage of an obligor's monthly net resources that increases based on the number of children. *See* Tex. Fam. Code § 154.125(b), (c) (setting out regular support for one child at 20% of net income and low-income support for one child at 15%). The Texas Family Code gives the trial court discretion to set child support based on the obligor's earning capacity where "the actual income of the obligor is significantly less than what the obligor could earn because of intentional unemployment or underemployment." *Id*. § 154.066. There must be a finding that the obligor consciously chooses to remain unemployed or underemployed. *Iliff,* 339 S.W.3d at 80. But there is nothing in the statute requiring further proof of the motive or purpose behind the unemployment or underemployment. *Id*. "Once the obligor has offered proof of his or her current wages, the obligee bears the burden of demonstrating that the obligor is intentionally unemployed or underemployed." *Id*. at 82. "The burden then shifts to the obligor, if necessary, to offer evidence in rebuttal." *Id*.

16

We will not disturb a trial court's child support order absent an abuse of discretion. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam). The test for an abuse of discretion is whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). A trial court also abuses its discretion by failing to analyze or apply the law correctly. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

*Application*

Urbina testified that she makes $15 per hour and works a maximum of 20 hours per week because that is all that her job allows. On cross-examination, she acknowledged she has "an associate's of science with honors" and "a bachelor's of science in biology with a minor in health professions" and she could work full time but testified that she could probably not get a full time job in a lab; "plus I'd rather be with my daughter." In her narrative testimony she stated,

> I was asked about my ability to get a job with 40 hours. Yes, I have the ability, but I choose to spend time with my daughter. I have no debt. I have minimal bills. I am in the position now to be able to work from home with a job that pays me so that I can pay my bills and be able to spend time with my daughter, as much time as possible. It is a very flexible job.

The trial court could have reasonably found that Urbina's intentional underemployment was related to her unilateral decision to pull I.R. out of public school and homeschool her—something she did in violation of the temporary order. That order gave each parent, "the right, subject to the agreement of the other parent conservator, to make decisions concerning the child's education." Rangel testified he did not agree to the change and that he would go back to the status quo; he would re-enroll I.R. in public school. Going forward, Urbina would not be homeschooling I.R., so if her limited work hours had been based on her decision to

17

homeschool I.R., that would no longer be a hindrance. *See Coburn v. Moreland*, 433 S.W.3d 809, 833 (Tex. App.—Austin 2014, no pet.).

The trial court's award of child-support was based on a full-time job at her current wage of $15.00 an hour, which Urbina testified she had "the ability" to get but chose not to. Under this standard of review, we hold the trial court did not abuse its discretion in its child-support determination and overrule Urbina's child support complaint. *See Iliff*, 339 S.W.3d at 83.

**Attorney's Fees**

Urbina argues that the trial court abused its discretion in awarding Rangel attorney's fees.

*Applicable Law and Standard of Review*

The Texas Family Code provides that, "In a suit under this title, the court may render judgment for reasonable attorney's fees[.]" Tex. Fam. Code § 106.002(a). "A claimant seeking an award of attorney's fees must prove the attorney's reasonable hours worked and reasonable rate by presenting sufficient evidence to support the fee award sought." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 501–02 (Tex. 2019). "Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when those services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.* at 502.

"The award of attorney's fees in a suit affecting the parent-child relationship is within the trial court's discretion." *Bruni v. Bruni*, 924 S.W.2d 366, 368 (Tex. 1996). "When no evidence or insufficient evidence supports an award [of attorney's fees], the court abuses its

18

discretion in making the award." *Woollett v. Matyastik*, 23 S.W.3d 48, 53 (Tex. App.—Austin 2000, pet. denied).

*Application*

Here, Urbina argues, as she did at trial, that Rangel did not show that the attorney's fees were reasonable or necessary. She asserts that the billing statements admitted at trial were so heavily redacted that they do not inform the reasonableness determination. But she argues that Rangel's multiple pleadings do; Rangel made most all the filings in the case, and what "has transpired in this case was at the behest of the attorneys." In other words, Urbina contends that Rangel created his own excessive fees by choosing to over-litigate the case. She also argues the fees were not necessary; she represented herself and Rangel could have done the same.

Rangel's counsel Keith Kleinhans testified regarding the services he and his wife provided to Rangel. He testified that he has been practicing civil litigation—mainly in family law and personal-injury law—for fourteen years, and that his billable rate is $450 an hour, with his wife's rate the same. He testified that rate "is reasonable" based on his "knowledge, skill and experience" and that the services charged were "necessary" to represent his client. He stated that Urbina caused higher than usual fees given her and Norman's behavior towards Rangel and counsel alike. Rangel had already paid around $10,000 himself. The outstanding bill was nearly $40,000, but counsel had written off around 75% of it—making the owed balance $9,154.02. And that was the amount of attorney's fees he sought. Rangel also submitted billing records to the court. The records are heavily redacted, but do show (1) particular services performed including preparing and attending hearings, drafting, reviewing and revising documents, and trial preparation, and how long each service took, (2) who performed those services—Kleinhans or his wife, (3) the dates those services were performed, (4) the reasonable amount of time required to

19

perform the services—ranging from .18 of an hour to 11.25 hours when both attorneys were working, and (5) the reasonable hourly rate for each person performing such services—$450. *See Rohrmoos Venture*, 578 S.W.3d at 502; *cf., Schultz v. Schultz*, No. 03-22-00762-CV, 2024 WL 3586020, at *5 (Tex. App.—Austin July 31, 2024, no pet.) (mem. op.) (finding evidence insufficient to support attorney's fees where attorney's testimony and billing records failed to provide detail as to specific tasks performed, who performed them, or amount of time it took to perform them).

We conclude that Rangel presented sufficient evidence to support the fee award sought and overrule Urbina's attorney's fee complaint.

**Judicial Conduct During the Trial**

Urbina argues that during the trial, Judge Madeleine Connor failed to comply with Canon 2A of the Texas Code of Judicial Conduct. Canon 2A provides that "[a] judge shall comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Tex. Code Jud. Conduct, Canon 2A. Specifically, Urbina argues Judge Connor failed to correctly interpret and apply the law as argued in her other four issues; played with her hair and acted bored; misspoke; allowed improper objections; made rulings and then questioned herself; and failed to submit requested findings and conclusions on the order of enforcement signed on March 2, 2023.

But "[t]he Code is designed to provide guidance to judges and . . . to provide a structure for regulating conduct through the State Commission on Judicial Conduct." *Id*. Thus, "Pursuant to Canon 8, a disciplinary action is the proper course to pursue when claiming that a judge has violated one of the canons of judicial conduct." *KB Realtron Mgmt. v. DeLeon*, No. 13-13-00411-CV, 2015 WL 7353375, at *4 (Tex. App.—Corpus Christi–Edinburg Nov. 19, 2015, no

20

pet.) (mem. op.); *see* Tex. Gov't Code § 33.0211 (addressing complaints filed with the State Commission on Judicial Conduct); *In re Bynum*, 704 S.W.3d 278, 284 (Tex. Spec. Ct. Rev. 2024) (per curiam) ("The Texas Constitution provides that a judge may be disciplined for . . . a willful violation of the Code of Judicial Conduct[.]").  This is true whether the type of alleged judicial error is legal or non-legal.  *Id*.  Because Urbina's remedy is to file a complaint with the State Commission on Judicial Conduct, we overrule Urbina's judicial-conduct complaint.

## CONCLUSION

Having overruled Urbina's issues related to the trial court's final order, we affirm the challenged portions of the order.  We dismiss the issue related to the order of enforcement for want of jurisdiction.

_____

Chari L. Kelly, Justice

Before Justices Triana, Kelly, and Theofanis

Affirmed in Part, Dismissed in Part for Want of Jurisdiction

Filed:   July 25, 2025

21